IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Elvis P.,[1] | ) | C/A No.: 1:20-2330-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Timothy M. Cain, United States District Judge, dated June 25, 2020, referring this matter for disposition. [ECF No. 9]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 8].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for Supplemental Security Income ("SSI"). The two issues before the court are

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On July 12, 2017, Plaintiff protectively filed an application for SSI in which he alleged his disability began on July 12, 2017. Tr. at 15, 177–82. His application was denied initially and upon reconsideration. Tr. at 107–10, 114–20. On February 15, 2019, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Joshua Vineyard. Tr. at 32–84 (Hr'g Tr.). The ALJ issued an unfavorable decision on April 9, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–31. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 19, 2020. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 41 years old at the time of the hearing. Tr. at 47. He completed the eighth grade. *Id.* His past relevant work ("PRW") was as a welder helper, a painter, and a store laborer. Tr. at 75–76. He alleges he has been unable to work since December 31, 2016.[2] Tr. at 45.

2.    Medical History

On October 20, 2015, Plaintiff presented to Mark A. Stellingworth, M.D. ("Dr. Stellingworth"), for routine cardiac follow up. Tr. at 341. Dr. Stellingworth noted Plaintiff had a history of ablation to treat atrioventricular nodal reentrant tachycardia. *Id.* He stated a coronary angiogram showed normal coronary arteries; lab studies were unremarkable, aside from slightly elevated triglycerides; and an echocardiogram ("echo") showed preserved left ventricular function. *Id.*

Plaintiff denied chest pain, but reported a recurrence of palpitations and shortness of breath on February 15, 2016. Tr. at 335. Dr. Stellingworth noted that Plaintiff had gained over 15 pounds since his last visit. *Id.* He scheduled Plaintiff for an echo and pulmonary function tests and ordered a 30-day cardiac event monitor. *Id.*

---

[2] During the hearing, Plaintiff's counsel moved to reopen a prior application filed on December 31, 2016, and to amend his onset date to the date of the prior application. *See* Tr. at 45, 197.

On February 26, 2016, Plaintiff underwent pulmonary function testing that showed moderate obstructive ventilatory defect that was consistent with either chronic obstructive pulmonary disease ("COPD") or asthma with fixed airway obstruction. Tr. at 294–300. Michelle-Anne Iverson, D.O., recommended bronchodilator therapy. Tr. at 294.

On March 25, 2016, Dr. Stellingworth explained that an echo demonstrated preserved left ventricular function and an event monitor had been unremarkable. Tr. at 326. He indicated pulmonary function testing showed obstructive lung disease and that Plaintiff had recently started Symbicort. *Id.* Dr. Stellingworth recorded normal findings on physical exam. Tr. at 328–29. He instructed Plaintiff to follow up in six months and ordered lab studies to be performed prior to the visit. Tr. at 329.

On March 30, 2016, Plaintiff presented to his primary care physician, William Davis, D.O. ("Dr. Davis"), for follow up as to panic disorder without agoraphobia, chronic pain syndrome, and obesity. Tr. at 354. He endorsed anxiety/depression that was associated with sleep disturbances, restlessness/agitation, and anxiety with muscle tension. *Id.* He also reported sharp and worsening pain in his lumbar spine, bilateral knees, left ankle, and right foot. Tr. at 354–55. Dr. Davis treated Plaintiff's back pain with an intramuscular injection of Ketorolac, Dexamethasone, and Depo-Medrol. Tr. at 357–58.

On April 25, 2016, Plaintiff presented to Dr. Davis for routine follow up. Tr. at 350. He reported throbbing pain in his bilateral hips that occurred daily; anxiety associated with muscle tension and panic symptoms that affected his abilities to sleep and work; and worsening pain in his lumbar spine, bilateral knees, left ankle, and right foot. *Id.* Dr. Davis noted limited ambulation, tenderness and muscle rigidity in the neck with spasms and reduced range of motion ("ROM"), rhonchi, tenderness and pain on palpation of the bilateral knees, swelling and tenderness of the left ankle and right foot, and spasms, tenderness, and reduced ROM of the lumbar spine. Tr. at 353. He prescribed Alprazolam 0.5 mg, Azithromycin 250 mg, Hydrocodone-Acetaminophen 10-325 mg, Lisinopril-Hydrocholorothiazide 20-25 mg, Loratadine 10 mg, Phentermine 37.5 mg, Promethazine-Codeine 6.25-10 mg, and Simvastatin 40 mg. Tr. at 353–54.

Plaintiff complained of an exacerbation of bilateral knee pain and lower back pain on June 15, 2016. Tr. at 413. He requested a cortisone shot. *Id.* Dr. Davis noted limited ambulation, swelling and crepitus of the left knee, and tenderness, spasms, and limited ROM of the lumbar and cervical spines. Tr. at 416. He administered an injection of Ketorolac, Dexamethasone, and Depo-Medrol. Tr. at 416–17. He ordered x-rays of Plaintiff's bilateral hips and knees. Tr. at 417.

On June 17, 2016, x-rays of Plaintiff's knees showed mild osteoarthritis. Tr. at 418. X-rays of his hips indicated early degenerative changes in the right hip and deformity from prior surgery and metallic screws in both hips. Tr. at 418–19.

Plaintiff presented to Nicolas LaBarre, M.D. ("Dr. LaBarre"), for a consultative examination on July 23, 2016. Tr. at 421–25. He complained of bilateral hip pain, knee pain, back pain, and supraventricular tachycardia. Tr. at 421. He indicated he had suffered from bilateral hip pain since undergoing hip surgery at the age of 16. *Id.* He said he had arthritis in both hips that was worse on the right. *Id.* He indicated he was taking methadone for treatment of chronic pain. *Id.* He also endorsed bilateral knee pain, swelling, and weakness with occasional instability. *Id.* He stated lower back pain caused difficulty standing to perform activities like washing dishes for long periods. Tr. at 421–22. He described approximately 15 incidents of supraventricular tachycardia over a five-year period that had sometimes required emergency room ("ER") visits. Tr. at 422. He said he was able to perform all activities of daily living ("ADLs"), except on some days when he had difficulty bending over to put on his shoes or pants. *Id.* He indicated he took short, frequent trips to the grocery store because he could not be in the store for long periods. *Id.*

Dr. LaBarre described Plaintiff as obese, noting he was 5'11" tall and weighed 289 pounds. Tr. at 423. He stated Plaintiff temporarily became tearful when recounting his history. *Id.* He observed crepitus in Plaintiff's bilateral knees, antalgic gait with and without a cane, normal straight-leg raising test, intact sensation to light touch and pinprick, normal deep tendon reflexes ("DTRs"), grossly intact cranial nerves, 5/5 strength in all groups tested, except for 4/5 strength in the bilateral hip flexors, and normal ROM, except for reduced internal rotation of the hips secondary to pain. Tr. at 423–25. He noted Plaintiff was unable to perform heel-to-toe ambulation and had episodic right hip pain spasms during exam. Tr. at 424, 425. He diagnosed osteoarthritis affecting the bilateral hips and knees, lumbago/chronic lower back pain, and supraventricular tachycardia. Tr. at 425. He provided the following impression:

> The claimant may exhibit limitations in the following areas: Standing, walking, sitting, lifting, carrying weights greater than 20 pounds, climbing, balancing, stooping, kneeling, crouching and crawling, working at heights, working around heavy machinery, working around extremes of temperature. In general most of this difficulty would be limited to performing these activities for long durations of time secondary to arthritis and chronic pain in multiple areas including his hips, knees, and back. Any activity requiring significant exertion or heavy lifting could potentiate his supraventricular tachycardia. It would be dangerous for him to work at heights or around heavy machinery given his history of supraventricular tachycardia. No other limitations found on today's exam.

*Id.*

7

Plaintiff followed up with Dr. Davis as to panic disorder without agoraphobia, essential hypertension, allergic rhinitis, and hyperlipidemia on August 23, 2016. Tr. at 478. Dr. Davis noted that Plaintiff was following up for chronic pain at the methadone clinic and was not taking Lorcet. *Id.* Plaintiff continued to endorse anxiety, depression, and pain that radiated from his lumbar spine to his bilateral legs and knees, left ankle, and right foot. *Id.* Dr. Davis noted the following on physical exam: limited ambulation; normal mental status; normal recent and remote memory; normal motor strength and tone; tenderness in the bilateral knees, left ankle, right foot, and cervical and lumbar spines; reduced ROM in the cervical and lumbar spines; good ROM in the bilateral knees, left ankle, and right foot; pain on palpation of the bilateral knees, left ankle, right foot, and cervical and lumbar spines; crepitus in the left knee; no crepitus in the right knee; spasms in the cervical and lumbar spines; grossly intact sensation; 2+ DTRs; and normal thoracolumbar curvature. Tr. at 481. He continued Plaintiff's medications. Tr. at 481–82. He also ordered x-rays of Plaintiff's lumbar spine that showed degenerative changes at the thoracolumbar junction without other acute findings. Tr. at 486.

On September 21, 2016, Plaintiff complained of a two-week history of bilateral leg pain and swelling. Tr. at 473. He denied chest pain and shortness of breath. *Id.* He indicated the swelling was reduced by elevating

his legs. *Id.* Dr. Davis noted the following on physical exam: limited ambulation; normal mental status; normal recent and remote memory; +3/4 pretibial edema; tenderness in the bilateral calves, bilateral knees, left ankle, right foot, and cervical and lumbar spines; reduced ROM in the cervical and lumbar spines; good ROM in the bilateral knees, left ankle, and right foot; pain on palpation of the bilateral knees, left ankle, right foot, and cervical and lumbar spines; crepitus in the left knee; no crepitus in the right knee; spasms in the cervical and lumbar spines; grossly intact sensation; 2+ DTRs; and normal thoracolumbar curvature. Tr. at 476–77. Dr. Davis ordered a venous ultrasound of the lower extremities and prescribed Lasix 40 mg. Tr. at 477. The venous ultrasound showed no evidence of deep venous thrombosis. Tr. at 484.

Plaintiff presented to Dr. Stellingworth for routine cardiology follow up on September 26, 2016. Tr. at 442. He indicated he was asymptomatic, aside from infrequent palpations. *Id.* His blood pressure and pulse were stable. *Id.* His weight had increased to 298 pounds. *Id.* He noted lower extremity edema had been relieved by Lasix. *Id.* Dr. Stellingworth indicated Plaintiff's lab studies were normal. *Id.* He recorded normal findings on physical exam. Tr. at 444–45. He indicated Plaintiff was stable from a cardiac standpoint and advised him to obtain lab studies and to follow up in three months. Tr. at 445.

Plaintiff presented to Dr. Davis for routine follow up and medication refills on October 24, 2016. Tr. at 469. Dr. Davis noted the following on physical exam: limited ambulation; normal mental status; normal recent and remote memory; +3/4 pretibial edema; tenderness in the bilateral calves, bilateral knees, left ankle, right foot, and cervical and lumbar spines; reduced ROM in the cervical and lumbar spines; good ROM in the bilateral knees, left ankle, and right foot; pain on palpation of the bilateral knees, left ankle, right foot, and cervical and lumbar spines; crepitus in the left knee; no crepitus in the right knee; spasms in the cervical and lumbar spines; grossly intact sensation; 2+ DTRs; and normal thoracolumbar curvature. Tr. at 472. He refilled Plaintiff's medications. Tr. at 472–73.

On November 26, 2016, Plaintiff presented to Christopher Dean Huiet, PA-C ("PA Huiet"), for evaluation of low back pain. Tr. at 427. He noted his back pain was related to activity and improved with rest. *Id.* He also endorsed bilateral hip pain. *Id.* He was 5'11" tall and weighed 299 pounds with a body mass index ("BMI") of 41.7. *Id.* PA Huiet noted reduced lumbar flexion, diffuse lumbar paraspinal tenderness, diffuse tenderness over the posterior sacrum, painful bilateral hip ROM, otherwise functional ROM, no focal neurological weakness, intact sensation, normal tone, and normal gait pattern. Tr. at 428. He reviewed x-rays of the lumbar spine that showed multi-level disc degenerative changes and facet degenerative changes at L4–5

and L5–S1. *Id.* He noted x-rays of the pelvis showed bilateral hip screws and mild-to-moderate joint space narrowing. *Id.* He diagnosed lumbar disc degeneration and bilateral hip effusion and recommended physical therapy. *Id.*[3]

Plaintiff presented to Carolina Pines Regional Medical Center ("CRPMC") for an initial physical therapy consultation on November 29, 2016. Tr. at 429. Physical therapist Aimee C. Neptuno-Addison ("PT Neptuno-Addison"), noted decreased lumbar lordosis, anterior pelvic tilt, antalgic gait, reduced ROM of the bilateral hips, reduced ROM of the lumbar spine, reduced flexion of the bilateral knees, and reduced hip, knee, and ankle strength. Tr. at 430–32.

On December 20, 2016, Dr. Davis noted the following on physical exam: limited ambulation; normal mental status; normal recent and remote memory; +3/4 pretibial edema; tenderness in the bilateral calves, bilateral hips, bilateral knees, left ankle, right foot, and cervical and lumbar spines; reduced ROM in the bilateral hips and cervical and lumbar spines; good ROM in the bilateral knees, left ankle, and right foot; pain on palpation of the bilateral hips, bilateral knees, left ankle, right foot, and cervical and lumbar spines; crepitus in the left knee; no crepitus in the right knee; spasms in the

---

[3] Dr. Davis's treatment notes reference Plaintiff's treatment with PA Huiet through December 2017, *see, e.g.*, Tr. at 653, but the record contains no additional treatment notes from PA Huiet.

cervical and lumbar spines; grossly intact sensation; 2+ DTRs; and normal lordosis and thoracolumbar curvature. Tr. at 467–68. He refilled Plaintiff's medications. Tr. at 468.

On December 29, 2016, Plaintiff reported infrequent palpitations that occurred for seconds at a time approximately three times a week. Tr. at 437. His blood pressure and pulse were stable. *Id.* Dr. Stellingworth counseled Plaintiff against continued cigarette smoking. *Id.* He noted Plaintiff had gained another five pounds and continued to treat with methadone. *Id.* He recorded normal findings on physical exam. Tr. at 439–40. He stated Plaintiff was clinically stable from a cardiac standpoint. Tr. at 440. He noted Plaintiff's lab studies were normal, aside from elevated glucose, but indicated Plaintiff stated he was not fasting. *Id.* He encouraged diet, exercise, and smoking cessation and advised Plaintiff to follow up in six months. *Id.*

Plaintiff presented to the ER at CPRMC with complaints of fever, chills, and pain with urination on February 6, 2017. Tr. at 523. An abdominal computed tomography ("CT") scan showed hepatic steatosis, but no evidence of nephroureterolithiasis or hydronephrosis. Tr. at 530. Steven Nathanson, M.D., diagnosed a urinary tract infection. Tr. at 531. He ordered intravenous Rocephin and Ciprofloxacin and discharged Plaintiff with prescriptions for Cipro 500 mg and Promethazine 25 mg. Tr. at 531, 532.

On February 20, 2017, Plaintiff reported that his insurance would not cover the physical therapy PA Huiet had recommended. Tr. at 460. Dr. Davis noted the following on physical exam: limited ambulation; normal mental status; normal recent and remote memory; +3/4 pretibial edema; tenderness in the bilateral calves, bilateral hips, bilateral knees, left ankle, right foot, and cervical and lumbar spines; reduced ROM in the bilateral hips and cervical and lumbar spines; good ROM in the bilateral knees, left ankle, and right foot; pain on palpation of the bilateral hips, bilateral knees, left ankle, right foot, and cervical and lumbar spines; crepitus in the left knee; no crepitus in the right knee; spasms in the cervical and lumbar spines; grossly intact sensation; 2+ DTRs; and normal thoracolumbar curvature. Tr. at 462–63.

Plaintiff presented to Dr. Davis for routine follow up and medication refills on April 19, 2017. Tr. at 456. Dr. Davis noted the following on physical exam: limited ambulation; normal motor strength and tone; bilateral calf tenderness; +3/4 pretibial edema; tenderness in the bilateral hips, bilateral knees, left ankle, right foot, cervical spine, and lumbar spine; crepitus in the left knee; no crepitus in the right knee; swelling in the left ankle and right foot; spasms in the cervical and lumbar spines; pain on palpation of the bilateral hips, bilateral knees, left ankle, and cervical and lumbar spines; reduced ROM of the bilateral hips and cervical and lumbar spines; good ROM

of the bilateral knees, left ankle, and right foot; grossly intact sensation; 2+ DTRs; and normal thoracolumbar curvature. Tr. at 458–59. He changed Klor-Con from twice to once a day and refilled Plaintiff's other medications. Tr. at 459.

Plaintiff complained of painful, bleeding hemorrhoids and constipation on May 30, 2017. Tr. at 451. Dr. Davis prescribed Nupercainal 1% ointment and referred Plaintiff to a general surgeon. Tr. at 455.

On June 4, 2017, Plaintiff presented to the ER at CPRMS with complaints of constipation and hemorrhoids that caused pain with bowel movements. Tr. at 543. Eric S. Tauscher, M.D., ordered Magnesium Citrate liquid for treatment of constipation. Tr. at 545–46.

Plaintiff presented to Thomas V. Mincheff, M.D. ("Dr. Mincheff"), for evaluation of abdominal pain and bleeding on June 7, 2017. Tr. at 493. He reported constipation, rectal pain, rectal bleeding, and hemorrhoids. *Id.* Dr. Mincheff noted a tender anorectal fissure fistula on exam. Tr. at 495. He assessed anal fissure, unspecified abdominal pain, constipation, and hemorrhage of anus and rectum. *Id.* He prescribed Dulcolax 10 mg suppository and Magnesium Citrate solution and ordered a colonoscopy. *Id.* The colonoscopy produced normal results on June 13, 2017. Tr. at 491.

Plaintiff endorsed anxiety, depression, lower extremity edema, and pain in his lumbar spine, bilateral knees, left ankle, and right foot on June

14, 2017. Tr. at 449. Dr. Davis noted the following on physical exam: limited ambulation; +3/4 posterior tibial edema; bilateral calf tenderness; tenderness, reduced ROM, and pain on palpation of the bilateral hips; tenderness and pain on palpation of the right knee; crepitus, tenderness, and pain on palpation of the left knee; good ROM of the bilateral knees; swelling, tenderness, and pain on palpation of the left ankle; good ROM of the left ankle; swelling and tenderness at the metatarsal heads of the right foot; good ROM of the right foot; spasms, reduced ROM and tenderness on palpation of the cervical spine; normal flexion and extension of the cervical spine; no tenderness or spasms and complete ROM of the thoracic spine; spasms, tenderness on palpation, reduced ROM, and normal lordosis of the lumbar spine; grossly intact sensation; 2+ DTRs; and normal curvature of the back. Tr. at 450–51. He refilled Plaintiff's medications. Tr. at 451.

Plaintiff followed up with Dr. Mincheff on June 22, 2017. Tr. at 497. He reported doing well and denied complaints. *Id.* Dr. Mincheff noted Plaintiff's colonoscopy was normal and his anorectal fissure fistula felt much better on exam. Tr. at 499. He discontinued Ducosate Sodium 100 mg and prescribed Colace 100 mg and a Lidocaine Nifedipine cream. *Id.*

Plaintiff presented to the ER at CPRMS for abdominal pain and constipation on August 10, 2017. Tr. at 561. He indicated he had not had a bowel movement in seven days. *Id.* Darlene M. Fischer, PA, noted normal

findings on a basic physical exam, but indicated Plaintiff would not allow her to perform a rectal exam because it was too painful. Tr. at 564. She discharged Plaintiff with instructions to use over-the-counter Magnesium Citrate or an enema and to take stool softeners. Tr. at 565.

Plaintiff presented to Dr. Davis for routine follow up on August 17, 2017. Tr. at 569. Dr. Davis noted the following on physical exam: limited ambulation; normal motor strength and tone; bilateral calf tenderness; +3/4 pretibial edema; tenderness in the bilateral hips, bilateral knees, left ankle, right foot, cervical spine, and lumbar spine; crepitus in the left knee; no crepitus in the right knee; swelling in the left ankle and right foot; spasms in the cervical and lumbar spines; pain on palpation of the bilateral hips, bilateral knees, left ankle, and cervical and lumbar spines; reduced ROM of the bilateral hips and cervical and lumbar spines; good ROM of the bilateral knees, left ankle, and right foot; grossly intact sensation; 2+ DTRs; and normal thoracolumbar curvature. Tr. at 572–73. He advised Plaintiff to continue stool softeners and Miralax for anal fissure and to follow up at the methadone clinic for chronic pain syndrome and with PA Huiet for degeneration of lumbar intervertebral disc. Tr. at 573. He refilled Alprazolam 0.5 mg, Metoprolol Tartrate 50 mg, and Klor-Con M20. *Id.*

Plaintiff presented to Dr. Davis for routine follow up on December 19, 2017. Tr. at 599. Dr. Davis noted the following on physical exam: limited

ambulation; normal motor strength and tone; bilateral calf tenderness; +3/4 pretibial edema; tenderness in the bilateral hips, bilateral knees, left ankle, right foot, cervical spine, and lumbar spine; crepitus in the left knee; no crepitus in the right knee; swelling in the left ankle and right foot; spasms in the cervical and lumbar spines; pain on palpation of the bilateral hips, bilateral knees, left ankle, and cervical and lumbar spines; reduced ROM of the bilateral hips and cervical and lumbar spines; good ROM of the bilateral knees, left ankle, and right foot; grossly intact sensation; 2+ DTRs; and normal thoracolumbar curvature. Tr. at 602. He refilled prescriptions for Lasix, Alprazolam and Metoprolol Tartrate and prescribed Amitiza for drug-induced constipation. Tr. at 602–03.

On January 25, 2018, state agency psychological consultant Samuel Goots, Ph.D. ("Dr. Goots"), reviewed the record and considered Listing 12.06 for anxiety and obsessive-compulsive disorders. Tr. at 90–91. He assessed Plaintiff as having mild limitations in his abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. *Id.*

Plaintiff presented to Dr. Stellingworth with complaints of shortness of breath and chest pain on February 2, 2018. Tr. at 586. He reported having stopped smoking one month prior. *Id.* He described mid-sternal chest pain that had been ongoing for two to three months and was accompanied by

diaphoresis, as well as palpitations that occurred four to five times a month and lasted for only a few seconds. *Id.* An electrocardiogram ("EKG") was unchanged from prior studies. Tr. at 589. Dr. Stellingworth scheduled Plaintiff for a Lexiscan, an echo, and routine lab studies and instructed him to follow up in two weeks. Tr. at 589.

Plaintiff underwent pulmonary function testing on February 9, 2018, that showed no decline in function from the prior studies. *Compare* Tr. at 294–95, *with* Tr. at 576–79.

On February 12, 2018, state agency medical consultant Maliha Khan, M.D. ("Dr. Khan"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk for a total of two hours; sit for a total of about six hours in an eight-hour workday; never climb ladders/ropes/scaffolds; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; and avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. Tr. at 92–95.

On February 19, 2018, Plaintiff's blood pressure was elevated at 150/72 mmHg. Tr. at 581. He reported occasional chest pain, but denied dizziness, syncope, and shortness of breath. *Id.* Dr. Stellingworth noted that an echo showed good left ventricular function, an ejection fraction of 60%, and mild tricuspid regurgitation. *Id.* He recorded normal findings on exam, aside from

obesity. Tr. at 584. He indicated a Lexiscan was normal and Plaintiff was stable from a cardiac standpoint and recommended he follow up in six months. *Id.*

Plaintiff presented to Dr. Davis for routine follow up on February 20, 2018. Tr. at 594. Dr. Davis documented the following on physical exam: limited ambulation; normal motor strength and tone; bilateral calf tenderness; +3/4 pretibial edema; tenderness in the bilateral hips, bilateral knees, left ankle, right foot, cervical spine, and lumbar spine; crepitus in the left knee; no crepitus in the right knee; swelling in the left ankle and right foot; spasms in the cervical and lumbar spines; pain on palpation of the bilateral hips, bilateral knees, left ankle, and cervical and lumbar spines; reduced ROM of the bilateral hips and cervical and lumbar spines; good ROM of the bilateral knees, left ankle, and right foot; grossly intact sensation; 2+ DTRs; and normal thoracolumbar curvature. Tr. at 597–98. He continued Plaintiff's medications for anxiety, hypertension, hyperlipidemia, and COPD. Tr. at 598. He noted Plaintiff had "weaned himself of narcotic analgesics" and was taking Tylenol and ibuprofen for pain. *Id.*

On March 14, 2018, a CT scan of Plaintiff's abdomen and pelvis showed no evidence of renal or ureteral stones, but revealed scattered calcified granulomas that suggested prior exposure to granulomatous disease and a thick-walled urinary bladder that suggested cystitis. Tr. at 656.

Plaintiff presented to Dr. Davis for medication management on April 19, 2018. Tr. at 645. Dr. Davis noted the following on physical exam: limited ambulation; normal motor strength and tone; bilateral calf tenderness; +3/4 pretibial edema; tenderness in the bilateral hips, bilateral knees, left ankle, right foot, cervical spine, and lumbar spine; crepitus in the left knee; no crepitus in the right knee; swelling in the left ankle and right foot; spasms in the cervical and lumbar spines; pain on palpation of the bilateral hips, bilateral knees, left ankle, and cervical and lumbar spines; reduced ROM of the bilateral hips and cervical and lumbar spines; good ROM of the bilateral knees, left ankle, and right foot; grossly intact sensation; 2+ DTRs; and normal thoracolumbar curvature. Tr. at 649. He refilled Alprazolam for panic disorder and Metoprolol Tartrate for essential hypertension and noted that Plaintiff continued to follow up at the methadone clinic for chronic pain syndrome. Tr. at 649–50.

Plaintiff followed up with Dr. Davis for medication refills on June 19, 2018. Tr. at 641. He indicated he was continuing to receive pain management treatment through the methadone clinic. Tr. at 644. Dr. Davis noted the following on physical exam: limited ambulation; normal motor strength and tone; bilateral calf tenderness; +3/4 pretibial edema; tenderness in the bilateral hips, bilateral knees, left ankle, right foot, cervical spine, and lumbar spine; crepitus in the left knee; no crepitus in the right knee; swelling

in the left ankle and right foot; spasms in the cervical and lumbar spines; pain on palpation of the bilateral hips, bilateral knees, left ankle, and cervical and lumbar spines; reduced ROM of the bilateral hips and cervical and lumbar spines; good ROM of the bilateral knees, left ankle, and right foot; grossly intact sensation; 2+ DTRs; and normal thoracolumbar curvature. Tr. at 644–45. He refilled Metoprolol Tartrate, Lisinopril-Hydrochlorothiazide, and Alprazolam. Tr. at 645.

On June 28, 2018, Plaintiff presented to Mark Coe, Ph.D. ("Dr. Coe"), for a consultative evaluation. Tr. at 608–11. He reported COPD, irregular heartbeat, anxiety, and chronic pain in his hips and back. Tr. at 608. He indicated he had developed anxiety around the same time that he developed an irregular heartbeat and that both problems had begun after he stopped abusing prescription pain medication. *Id.* He stated he did not like to be alone because he feared that he would be unable to address a heart problem if it arose. *Id.* He said he experienced panic attacks when entering public settings alone and traveling away from home because he feared he would not be able to get to the hospital, if necessary. *Id.* He stated he experienced a panic attack nearly every time he left his home alone and, as a result, left his home alone only three times a month. *Id.* He endorsed panic attacks that occurred once a week and were associated with irregular heartrate. *Id.* He admitted his panic attacks were reduced by use of Xanax and heart medications. *Id.*

Plaintiff denied depression and indicated he had never participated in therapy. *Id.* He reported performing chores independently, but indicated he occasionally took breaks because of his back pain. Tr. at 609. He noted he was able to prepare simple meals and manage self-care activities. *Id.* He stated he struggled with managing money and handling retail transactions involving large sums of money. Tr. at 609–10. He said he required assistance with reading financial, medical, and other complicated documents. Tr. at 610.

Dr. Coe observed Plaintiff to be oriented in all spheres, to demonstrate normal speech, to have good eye contact, and to demonstrate euthymic mood and appropriate affect. *Id.* He stated Plaintiff's general fund of knowledge and awareness of current events were below average. *Id.* He noted Plaintiff appeared to have no disturbance of thought and adequate attention and impulse control. *Id.* He indicated Plaintiff remembered three words immediately and after a delay, but was unable to perform serial seven calculations or spell "world" backwards. *Id.* He stated Plaintiff adequately performed naming, reading, repetition, and three stage command tasks and scored 26 of 30 points on the Folstein Mini Mental Status Exam. *Id.* Dr. Coe wrote:

> Given [Plaintiff's] report of academic struggles, being retained several times during his academic career, receiving special education services as a student, and presenting with deficits in functional academic skills as an adult, he may benefit from more extensive psychological testing to determine if he presents with

cognitive and/or academic deficits that may impair his ability to manage financial affairs independently.

*Id.* He diagnosed opioid use disorder, reportedly in full remission, and indicated need to rule out other specified somatic symptom disorder, panic disorder, borderline intellectual functioning, and specific learning disorder. *Id.* He stated Plaintiff "may struggle to travel to or for work alone or enter work related settings without another adult he trusts." *Id.* He further noted: "Any work related activities should likely be conducted in a small group environment with individual's familiar with [Plaintiff's] irregular heartbeat and anxiety symptoms." Tr. at 610–11. He stated Plaintiff's ability to manage his anxiety might be improved through cognitive behavioral therapy and medication management from a psychiatrist. Tr. at 611.

Plaintiff complained of weakness and fatigue on August 16, 2018. Tr. at 637. Dr. Davis noted the following on physical exam: limited ambulation; normal motor strength and tone; bilateral calf tenderness; +3/4 pretibial edema; tenderness in the bilateral hips, bilateral knees, left ankle, right foot, cervical spine, and lumbar spine; crepitus in the left knee; no crepitus in the right knee; swelling in the left ankle and right foot; spasms in the cervical and lumbar spines; pain on palpation of the bilateral hips, bilateral knees, left ankle, and cervical and lumbar spines; reduced ROM of the bilateral hips and cervical and lumbar spines; good ROM of the bilateral knees, left ankle, and right foot; grossly intact sensation; 2+ DTRs; and normal thoracolumbar

curvature. Tr. at 640. He continued Metoprolol Tartrate 50 mg and Alprazolam 0.5 mg. Tr. at 640–41.

Plaintiff followed up with Dr. Davis for medication refills on October 16, 2018. Tr. at 632. He reported no new problems or complaints. *Id.* Dr. Davis noted the following on physical exam: limited ambulation; normal motor strength and tone; bilateral calf tenderness; +3/4 pretibial edema; tenderness in the bilateral hips, bilateral knees, left ankle, right foot, cervical spine, and lumbar spine; crepitus in the left knee; no crepitus in the right knee; swelling in the left ankle and right foot; spasms in the cervical and lumbar spines; pain on palpation of the bilateral hips, bilateral knees, left ankle, and cervical and lumbar spines; reduced ROM of the bilateral hips and cervical and lumbar spines; good ROM of the bilateral knees, left ankle, and right foot; grossly intact sensation; 2+ DTRs; and normal thoracolumbar curvature. Tr. at 635–36. He continued the same medications. Tr. at 636.

Plaintiff presented to Dr. Davis with an abscessed tooth on December 17, 2018. Tr. at 627. Dr. Davis noted poor dentition and an abscessed incisor in the right lower jaw, in addition to the findings he typically recorded on exams. Tr. at 631. He prescribed Clindamycin HCl 300 mg for a periapical abscess. Tr. at 632.

Plaintiff presented to Tonnie Spivey, FNP ("NP Spivey"), for elevated blood sugar on December 26, 2018. Tr. at 624. He described increased thirst,

feeling more tired than normal, and tingling on the bottom of his feet over the prior month-and-a-half. Tr. at 625. He indicated his wife had checked his blood sugar the prior day and it was 406 mg/dL and dropped to 242 mg/dL after he took Metformin 500 mg from a family member's prescription. Tr. at 625. He admitted to drinking a lot of Mountain Dew. *Id.* NP Spivey noted the following on physical exam: obesity with BMI of 39.3; limited ambulation; poor dentition; +3/4 pretibial edema; normal mood and affect; normal recent and remote memory; complaints of burning and tingling in feet; normal gait and station; grossly intact sensation; 2+ DTRs; and normal thoracolumbar curvature. Tr. at 626. Plaintiff's blood glucose was 331 mg/dL. Tr. at 627. NP Spivey assessed paresthesia of lower extremity, increased frequency of urination, family history of diabetes mellitus, and increased thirst. *Id.* She ordered lab studies and instructed Plaintiff to follow up to discuss the results the following day with Dr. Davis. *Id.*

On December 27, 2018, Plaintiff complained of feeling thirsty and tired, burning on the bottom of his feet, and low energy. Tr. at 619. He indicated his blood glucose readings were 354 and 406 mg/dL when he checked at home and his hemoglobin A1c had most recently been 11.67%. *Id.* Dr. Davis noted the following on physical exam: limited ambulation; poor dentition with abscessed right lower incisor; normal motor strength and tone; bilateral calf tenderness; +3/4 pretibial edema; tenderness in the bilateral hips, bilateral

knees, left ankle, right foot, cervical spine, and lumbar spine; crepitus in the left knee; no crepitus in the right knee; swelling in the left ankle and right foot; spasms in the cervical and lumbar spines; pain on palpation of the bilateral hips, bilateral knees, left ankle, and cervical and lumbar spines; reduced ROM of the bilateral hips and cervical and lumbar spines; good ROM of the bilateral knees, left ankle, and right foot; grossly intact sensation; 2+ DTRs; and normal thoracolumbar curvature. Tr. at 622–23. He diagnosed diabetes, referred Plaintiff for diabetes education and to a nutritionist, encouraged regular exercise and weight reduction, prescribed blood sugar monitoring strips and Metformin 500 mg, and advised him to check his blood sugar twice a day. Tr. at 623.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on February 15, 2019, Plaintiff testified he lived with his wife and three children, ages 13, 15, and 18. Tr. at 46, 71. He stated he last worked in construction in 2011. Tr. at 47. He indicated he previously worked in 2006 and 2007 as a welder's helper, lifting 20 to 30 pounds. Tr. at 48–49. He said he worked part-time as a painter in 2005. Tr. at 50. He stated he worked as an order filler for Wal-Mart in 2004. Tr. at 53–56.

Plaintiff testified he had a driver's license, but could only drive if someone else was with him because he had previously experienced panic attacks while driving. Tr. at 59. He said his driving mainly consisted of driving his son to school each morning. *Id.* He indicated his normal weight was 200 pounds, but he presently weighed 282 pounds, as he was not as active as he had been in the past. *Id.* He stated he had been enrolled in regular and special education classes while he was in school. *Id.* He said he could read a newspaper, but could not comprehend the material. Tr. at 60.

Plaintiff testified that his ability to work was most affected by pain in his hips and legs. *Id.* He indicated he had undergone two surgeries to his hips when he was in the fifth and sixth grades. *Id.* He denied having had additional surgical intervention, but noted his doctors had indicated he would require total hip replacement by age 50. *Id.* He said the hardware remained in place. *Id.* Plaintiff indicated the pain in his hips had worsened over the prior three years and had affected his mobility. Tr. at 61. He said he had pain throughout his legs and into his feet. *Id.* He admitted he was using a cane and said he had used it for about four years. *Id.* He stated he required the cane to stand and balance, but did not typically use it in the house because he could hold onto things. *Id.* He described tightness and pain in his lower back and noted his doctors had informed him that the pain was coming from his hips. *Id.* He stated his hips had nearly collapsed. Tr. at 62.

Plaintiff admitted he had undergone an ablation procedure to his heart and testified that he continued to have heart problems. *Id.* He said his heartrate would increase if he failed to take his medication. *Id.* He noted that his heart skipped beats for 10 to 15 minutes, two or three times a day even when he took his medication as prescribed. Tr. at 62–63. He indicated he had to try to calm himself when this occurred. Tr. at 63.

Plaintiff admitted he also had COPD. *Id.* He stated he had stopped smoking six months prior. *Id.* He noted he used Symbicort. *Id.* He testified that he felt short of breath when he attempted to sweep the floor. Tr. at 64.

Plaintiff denied side effects from medications. *Id.* He said he was using methadone and ibuprofen for pain. *Id.* He admitted that he was taking methadone because he had previously had a problem with opioid use. *Id.* He indicated he had problems with a fissure and hemorrhoids. *Id.* He stated the problems had presented a year earlier, recurred approximately every other month, and lasted for a month at a time. Tr. at 64–65. He said they limited him to sitting for about 30 minutes at a time. Tr. at 65. He denied being able to walk a block and said he stopped twice as he walked from the parking lot to the hearing area. *Id.*

Plaintiff testified his doctor had prescribed Xanax for his anxiety disorder. *Id.* He said he experienced three panic attacks a week, despite taking Xanax a couple times a day. Tr. at 65–66. He described his panic

attacks as involving his chest tightening up and noted they lasted 30 minutes to an hour. Tr. at 66. He said he felt as if he were hyperventilating. *Id.* He noted his son and wife would try to calm him down and talk him through the panic attacks if they were around when one occurred. *Id.*

Plaintiff denied having any hobbies. *Id.* He said his wife helped him to bathe, groom, and dress. *Id.* He noted she helped him get down into the bathtub when he needed to soak. Tr. at 67. He stated he washed dishes. *Id.* He indicated he could perform a chore for 10 minutes prior to resting for 15 to 20 minutes. *Id.* He denied socializing with friends regularly. *Id.* He described his sleep as poor and estimated that he slept for five to six hours during the night. *Id.* He said his energy was poor during the day and indicated he took naps for one to two hours on approximately three days per week. Tr. at 67–68.

Plaintiff testified he watched television during a typical day and could follow along "[s]omewhat." Tr. at 68. He admitted that he could watch a 30-minute television show. *Id.* He said he was most comfortable when lying down or reclining in a recliner with his legs straight out in front of him, as it helped his lower back and legs. Tr. at 68–69. He indicated he spent one to two hours a day lying down and sat reclined for most of the rest of the day. Tr. at 69.

Plaintiff testified that he had been taking methadone for six years. *Id.* He denied having a problem with opioids since starting methadone. Tr. at 70. He said his wife had driven him to the hearing. *Id.* He indicated they had not stopped during the 45-minute trip. *Id.* He said his wife, his oldest son, or his mother would typically attend his doctors' visits with him. *Id.* He noted his wife worked full-time and his two younger children were in school during the day. Tr. at 70–71. He admitted he could prepare food like a sandwich. Tr. at 72. He said he visited the grocery store once a week with his wife. *Id.* He indicated he could walk through the store with his cane, but sometimes had to stop to rest. Tr. at 72–73.

b.    Vocational Expert Testimony

Vocational Expert ("VE") William Stewart, Ph.D., reviewed the record and testified at the hearing. Tr. at 73–83. The VE categorized Plaintiff's PRW as a welder helper, *Dictionary of Occupational Titles* ("*DOT*") number 819.687-014, as requiring heavy exertion per the *DOT* and medium exertion as performed, with a specific vocational preparation ("SVP") of 2; a painter, *DOT* number 840.381-010, as requiring medium exertion with an SVP of 7 per the *DOT* and 4 or 5 as performed; and a store laborer, *DOT* number 922.687-058, as requiring medium exertion with an SVP of 2. Tr. at 75–76.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the sedentary exertional level; never climb

ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; tolerate occasional exposure to extreme heat, extreme cold, wetness, humidity, fumes, odors, dusts, gases, and poorly ventilated areas; avoid all exposure to hazards such as unprotected heights and moving machinery; perform simple, routine tasks that would be consistent with a reasoning level of two or less as defined within the *DOT*; work in an environment free from production-rate pace, such as a that of an assembly line; require no more than occasional changes in work setting or duty; engage in simple, work-related decision-making that did not involve the direct exchange of money; occasionally interact with supervisors and the public; occasionally interact with coworkers and work in proximity to them without engaging in direct teamwork or tandem tasks; and must be permitted to independently complete his own work assignments. Tr. at 76–77. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 77. The ALJ asked whether there were any other jobs in the economy that the hypothetical person could perform. *Id.* The VE identified sedentary jobs with an SVP of 2 as an assembler, *DOT* number 713.687-018, an inspector, *DOT* number 726.684-050, and a machine operator, *DOT* number 781.682-010, with 70,000, 50,000, and 40,000 positions in the economy, respectively. Tr. at 78. He noted he had reduced the number of jobs to accommodate the limitation on production. *Id.* The ALJ

asked the VE to reconcile his identification of machine operator jobs with the restriction in the hypothetical question for no exposure to moving machinery. *Id.* The VE testified that he was considering closed machines that would mainly involve pushing a button or pulling a lever. *Id.*

For a second hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was restricted as described in the first question and to further assume that the individual could never interact with the public. Tr. at 79. He asked if the individual would be able to perform jobs in the economy. *Id.* The VE testified that the individual would be able to perform the jobs identified in response to the first hypothetical question. *Id.*

For a third hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was restricted as described in the second hypothetical and to further assume that the individual must be permitted to use an ambulatory assistive device, such as a single-tipped cane, on an as-needed basis for standing and walking activities, with the contralateral extremity capable of lifting, carrying, pushing, and pulling up to the sedentary exertional limits. Tr. at 79–80. He asked if the individual would be able to perform any jobs. Tr. at 80. The VE testified that the jobs previously identified were "primarily seated jobs" and that if the individual

"remained productive . . . at the work station," the jobs would exist in the same numbers. *Id.*

For a fourth hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was restricted as indicated in the third hypothetical and would be off task for 15 percent of the workday, exclusive of scheduled breaks. Tr. at 80–81. He asked if there would be any jobs that the individual could perform. Tr. at 81. The VE testified that there would be no jobs for an individual who would be off task for 15 percent of the workday. *Id.*

The ALJ asked the VE if his testimony was consistent with the *DOT*. Tr. at 81–82. The VE stated it was, except that the *DOT* did not address specific distinctions as to climbing, time off-task, or use of a cane. Tr. at 82.

Plaintiff's representative asked the VE to consider that the hypothetical individual would be absent from work on two or more days per month on a recurring basis. *Id.* He asked if there would be any jobs for such an individual. *Id.* The VE testified that no jobs would allow an individual to miss work that often. *Id.*

Plaintiff's representative asked the VE to consider a hypothetical individual who could not enter the work setting without another adult he trusted. Tr. at 83. He asked if this would affect the jobs previously listed or if

there would be other jobs such an individual could perform. *Id.* The VE stated

it would rule out all work. *Id.*

2.    The ALJ's Findings

In his decision dated April 9, 2019, the ALJ made the following findings

of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity
      since December 31, 2016, the amended alleged onset date (20
      CFR 416.971 *et seq.*).
2.    The claimant has the following severe impairments: degenerative
      disc disease of the lumbar spine, degenerative joint disease of the
      bilateral hips, status-post remote pinning, osteoarthritis of the
      bilateral knees, obesity, chronic obstructive pulmonary disease,
      and panic disorder (20 CFR 416.920(c)).
3.    The claimant does not have an impairment or combination of
      impairments that meets or medically equals one of the listed
      impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
      416.920(d), 416.925 and 416.926).
4.    After careful consideration of the entire record, the undersigned
      finds that the claimant has the residual functional capacity to
      perform sedentary work as defined in 20 CFR 416.967(a) and is
      further limited to the following: he must be permitted to use an
      ambulatory assistive device such as a single-tipped cane as
      needed for standing and walking activities, with his contralateral
      upper extremity capable of lifting, carrying, pushing, and pulling
      up to the sedentary exertional limits. He can never climb ladders,
      ropes, or scaffolds and can occasionally balance, stoop, kneel,
      crouch, crawl, and climb ramps and stairs. He can tolerate
      occasional exposure to extreme heat, extreme cold, wetness,
      humidity, fumes, odors, dusts, gases, and poorly ventilated areas,
      and must avoid all exposure to hazards such as unprotected
      heights and moving machinery. Moreover, he remains capable of
      simple, routine tasks consistent with a reasoning development
      level of 2 or less in an environment free from production-rate
      pace and that requires no more than occasional changes in work
      setting or duties. He can engage in simple work-related decision
      making, but cannot engage in work involving the direct exchange
      of money. He can occasionally interact with supervisors and can

never interact with the public as part of his assigned work duties. He can occasionally interact with co-workers and work in proximity to them, but cannot engage in direct teamwork or tandem tasks, i.e., he must be permitted to independently complete his own work assignments.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on January 28, 1978 and was 39 years old, which is defined as a younger individual age 18–44, on the date the application was filed (20 CFR 416.963).

7.    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since December 31, 2016, the amended alleged onset date (20 CFR 416.920(g)).

Tr. at 18–25.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not explain the RFC assessment as required pursuant to SSR 96-8p;

2)    the ALJ did not consider Plaintiff's subjective allegations in accordance with SSR 16-3p; and

3)    the ALJ failed to identify and resolve a conflict between the VE's testimony and the job descriptions in the *DOT*.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a),

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

(b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied

the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     RFC Assessment

Plaintiff argues the ALJ failed to explain how the impairments supported the limitations he included in the RFC assessment. [ECF No. 19 at 17]. He specifically maintains the ALJ did not reconcile his findings that impaired ability to concentrate, persist, and maintain pace would preclude him from performing work at a production pace, but that he could independently complete work assignments and meet an employer's standards of production. *Id.* at 19. He points out that the Fourth Circuit has viewed restrictions involving production pace with skepticism. *Id.* at 20–21. He further contends the ALJ failed to include a rationale explaining the physical restrictions he assessed given evidence as to inability to sit, stand, or walk for prolonged periods, a need for support while standing, and a requirement to recline or elevate his feet while sitting. *Id.* at 21.

The Commissioner argues the ALJ's RFC assessment satisfies the substantial evidentiary standard. [ECF No. 22 at 19]. He maintains Plaintiff has not identified further limitations that were supported by the record. *Id.* at 21. He contends the ALJ addressed Plaintiff's musculoskeletal impairments, respiratory condition, and mental impairments and provided reasons for rejecting additional restrictions. *Id.* at 20–22. He claims the ALJ adequately addressed Drs. LaBarre's and Coe's opinions in explaining the

RFC assessment. *Id.* at 22–23. He maintains there is no error in the restriction as to "production-rate pace" because the ALJ adequately described what he meant by the term and the VE testified that he had reduced the number of jobs to account for the restriction. *Id.* at 23–24.

A claimant's RFC represents "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). The ALJ must "consider all of the claimant's 'physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect [the claimant's] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016)).

In *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), the court declined to adopt a per se rule requiring remand when the ALJ did not perform an explicit function-by-function analysis, explaining that "remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" However, it further provided that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

"[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas*, 915 F.3d at 311. The ALJ should

consider all the relevant evidence and account for all the claimant's medically-determinable impairments. 20 C.F.R. § 416.945(a). He must include a narrative discussion that cites "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)" and explains how all the relevant evidence supports each conclusion. SSR 96-8p, 1996 WL 374184, at *7. He must also explain how any material inconsistencies or ambiguities in the record were resolved." SSR 16-3p, 2016 WL 1119029, at *7. "A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling," including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288 (4th Cir. 2013).

The Fourth Circuit recently addressed the RFC assessment in *Dowling v. Commissioner of Social Security Administration*, 986 F.3d 377, 387 (4th Cir. 2021). It explained:

> Here, the ALJ relied on an incorrect regulatory framework when he assessed Appellant's RFC. He did not cite to 20 C.F.R. § 416.945, the section of the Code of Federal Regulations that is titled "Your residual functional capacity," and explains how ALJs should assess a claimant's RFC. Nor did he cite SSR 96-8p, the 1996 Social Security Ruling that provides guidance on how to properly evaluate an RFC. Finally, the ALJ did not indicate that his RFC assessment was rooted in a function-by-function analysis of how Appellant's impairments impacted her ability to work. Instead, the ALJ's RFC determination was based entirely on SSRs 96-7p and 16-3p, which set out the process ALJs use to "evaluate the intensity and persistence of [a claimant's]

symptoms" and determine "the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the record." SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). Of course, a claimant's symptoms, and the extent to which the alleged severity of those symptoms is supported by the record, is relevant to the RFC evaluation. *See* 20 C.F.R. § 416.945(a)(3) (stating that when evaluating an RFC, an ALJ should consider "limitations that result from the claimant's symptoms, such as pain"). But an RFC assessment is a separate and distinct inquiry from a symptom evaluation, and the ALJ erred by treating them as one and the same.

The ALJ in this case committed a similar error to that of the ALJ in *Dowling*, neglecting to address 20 C.F.R. § 416.945 and SSR 96-8p and focusing instead on 20 C.F.R. § 416.920c and §416.929 and SSR 16-3p. After stating the RFC assessment, the ALJ indicated he had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p." Tr. at 21. He further stated he had "considered the medical opinion(s) and prior administrative medical findings in accordance with the requirements of 20 CFR 416.920c." *Id.* He then proceeded to summarize Plaintiff's testimony and other statements prior to concluding that his "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. at 22. He subsequently provided a three-paragraph summary of the medical evidence. *See* Tr. at 22–

23. He indicated "the medical evidence of record supports the residual functional capacity and the restrictions as indicated above." Tr. at 23. Nowhere in his decision did the ALJ reference 20 C.F.R. § 416.945 or SSR 96-8p or address their requirements.

In *Dowling*, 986 F.3d at 388, the court found "[t]he ALJ's reliance on an incorrect regulatory framework led to an erroneous RFC assessment." It stated the ALJ erred in assessing the claimant's RFC "in terms of [] exertional levels of work" without first engaging in "a function-by-function analysis." *Id.* (citing *Monroe*, 826 F.3d at 179; *Thomas* 916 F.3d at 311, 312).

Here, the ALJ did the same. He stated, "an independent review of the records suggest a number of orthopedic issues that make a sedentary RFC and cane use reasonable." Tr. at 23. The ALJ noted Dr. LaBarre had indicated Plaintiff "'may exhibit' limitations in all postural areas, temperature extremes and working around hazards," "limited the claimant to no hazards," "stated that it would be difficult for him to perform activity for extended periods," and found him "unable to do 'significant exertion or heavy lifting.'" *Id.* He considered Dr. LaBarre's report "unpersuasive," writing:

> These limitations are vague and of limited assistance, as it requires speculation as to the most the claimant can do and there is no mention of the need for a cane despite observing it, and the examiner did not account for any respiratory based limitations. Furthermore, this was a one-time examination; however, the undersigned is independently limiting the claimant to sedentary exertion, which appears at least somewhat consistent with the vague limitations the examiner would suggest. The undersigned

> is adopting the limitations where possible, but is relying on the records for the exact limitations since none are given in the report.

*Id.* He included in the RFC assessment the restrictions he faulted Dr. LaBarre for failing to address, finding that Plaintiff "must be permitted to use an ambulatory assistive device such as a single-tipped cane as needed for standing and walking activities" and could "tolerate occasional exposure" to "wetness, humidity, fumes, odors, dusts, gases, and poorly ventilated areas," presumably to account for respiratory limitations. Tr. at 21. In addition to limiting Plaintiff to sedentary work, the ALJ limited Plaintiff's exposure to extreme cold and heat and hazards in conformity with Dr. LaBarre's opinion. *Compare* Tr. at 21, *with* Tr. at 425.

The ALJ did not engage in a function-by-function analysis of Plaintiff's abilities to sit, stand, walk, lift, and carry to provide support for the finding that he could perform sedentary work. This was consequential given Plaintiff's testimony that he could only sit for 30 minutes at a time, Tr. at 65, and Dr. LaBarre's indication that Plaintiff could not engage in sitting "for long durations of time," Tr. at 425. Somewhat consistent with Dr. LaBarre's opinion, the ALJ included postural restrictions, but did not explain why he found Plaintiff could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs and never climb ladders, ropes, or scaffolds. *See* Tr. at 21. He did not address whether Plaintiff would need to elevate his feet while

sitting, despite his testimony that he routinely elevated his feet and Dr. Davis's routine observations of lower extremity edema. *See, e.g.*, Tr. at 21, 450, 472, 498, 622, 649.

The ALJ similarly failed to perform a function-by-function analysis in evaluating Plaintiff's mental restrictions. He found Plaintiff's "use of Xanax, his primary care physician's diagnosis of panic disorder, and his alleged history of special education assistance" were accounted for through the assessment of "non-disabling limitations." Tr. at 23. Those limitations were as follows:

> [H]e remains capable of simple, routine tasks consistent with a reasoning development level of 2 or less in an environment free from production-rate pace and that requires no more than occasional changes in work setting or duties. He can engage in simple work-related decision making, but cannot engage in work involving the direct exchange of money. He can occasionally interact with supervisors and can never interact with the public as part of his assigned work duties. He can occasionally interact with co-workers and work in proximity to them, but cannot engage in direct teamwork or tandem tasks, i.e., he must be permitted to independently complete his own work assignments.

Tr. at 21.

The ALJ found Dr. Coe's report "somewhat persuasive," though he considered "invalid" his "suggestion that [Plaintiff was] unable to work without a trusted adult," noting Plaintiff "demonstrated greater abilities throughout the record and such a limitation [was] unsupported by the testing conducted by the examiner" and "stem[med] directly from the claimant's own

self-reporting (Exhibit 15F)." Tr. at 23, 24. Although he acknowledged that Plaintiff "presented as somewhat low functioning," he considered the authority of the report to be reduced by the one-time nature of the exam and Dr. Coe's reliance on Plaintiff's self-reports. Tr. at 24. He stated the RFC reflected clinical testing that showed some issues with reading and writing and with Plaintiff's history of special education assistance. *Id.* However, he noted Plaintiff's school records showed frequent absences "that would certainly affect his ability to learn," as opposed to a history of special education. *Id.*

The ALJ provided reasons for rejecting elements of Dr. Coe's opinion, but failed to explain how the "persuasive" opinion informed the RFC assessment. He provided no examples to support his statement that Plaintiff "demonstrated greater abilities throughout the record," Tr. at 23, than those opined to by Dr. Coe. The ALJ did not reconcile his finding that Plaintiff could not perform production-pace work with the finding that he could work independently. He also failed to reconcile the finding that Plaintiff could work independently with Dr. Coe's opinion that "[a]ny work related activities should likely be conducted in a small group environment with individual's familiar with [Plaintiff's] irregular heartbeat and anxiety symptoms." Tr. at 610–11.

Because the ALJ did not engage the proper regulatory framework, neglected to perform a function-by-function analysis, and failed to reconcile conflicting evidence, substantial evidence does not support his RFC assessment.

### 2.    Additional Allegations of Error

Plaintiff argues the ALJ provided an insufficient explanation to support a conclusion that his statements were inconsistent with a disability finding. [ECF No. 19 at 22]. He further maintains the ALJ failed to resolve an apparent conflict between the VE's testimony and the information in the *DOT. Id.* at 14–15.

The undersigned declines to address Plaintiff's additional allegations of error given the recommendation for remand, but notes that the ALJ's evaluation of Plaintiff's subjective allegations and his step five determination were afflicted by his failure to perform a function-by-function analysis.

## III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

48

IT IS SO ORDERED.

March 9, 2021                              Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge